UNITED STATES of America

v.

**Washington James NORWOOD, Jr.**

**Crim. No. 87–00063–P–01.**

United States District Court,
D. Maine.

Nov. 6, 1987.

Nicholas M. Gess, Asst. U.S. Atty., Portland, Me., for plaintiff.

David J. Ferrucci, Westbrook, Me., for defendant.

MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

GENE CARTER, District Judge.

I. *Procedural Posture of the Case*

This matter is before the Court on the motion of the Defendant, Washington

James Norwood, Jr., filed on September 11, 1987, "to suppress all statements made to Special Agent Garrey E.W. Barnes or others on July 7, 1987." Motion to Suppress. Defendant was indicted by a grand jury of this district on July 22, 1987 in a three-count indictment charging in Count I that on or about July 7, 1987, the Defendant and a codefendant, his wife, Marion Alice Norwood, committed the offense of armed bank robbery at the Casco Northern Bank N.A. in West Buxton, Maine. Count II of the indictment alleges that the Defendant utilized a firearm, in violation of 18 U.S.C. § 924(c)(1), in carrying out the bank robbery. Count III alleges that at the time of the commission of the bank robbery the Defendant was an "armed career criminal," in violation of 18 U.S.C. §§ 922(g) and 924(e), by virtue of three prior convictions of offenses punishable by imprisonment for a term exceeding one year. In support of the motion to suppress the Defendant's statements, counsel urges that the statements were both involuntarily made and secured after a defective administration of the *Miranda* warnings.

A hearing was held on said motion on September 24, 1987, at which testimony was given by FBI Special Agent Garry E.W. Barnes, Steven P. Marchessault, a Maine State Police trooper, and Marion Norwood, wife of Defendant Washington James Norwood, Jr. The Government's Exhibits S-1 through S-4, inclusive, were admitted in evidence at the hearing.[1]

On the evidence adduced at the hearing, the statements sought to be suppressed fall into two categories. Falling into the first category is a confession by the Defendant, made in the course of interrogation by Special Agent Barnes, to the robbery of the Casco Northern Bank in West Buxton, Maine, detailing the circumstances and events of the robbery and also describing the Defendant's travels following his escape from the Maine State Prison in Bucks Harbor, Maine several days prior to the occurrence of the robbery. These statements were made in the course of an admittedly custodial interrogation conducted by Special Agent Barnes at the Bridgton Police Station on July 7, 1987, the day of the robbery. The substantive content of the Defendant's statements in the course of such interrogation is purportedly exemplified in Government's Exhibits S-2 and S-3. The second category consists of certain statements made by Defendant in the presence of Maine State Trooper Marchessault and an unidentified Bridgton Police officer while he was being transported in the trooper's cruiser from the scene of the Defendant's apprehension to the Bridgton Police Department headquarters.[2] These statements are purportedly exemplified in Government's Exhibit S-1.

## II. *Findings of Fact*

### A. *The Statements Made to Special Agent Barnes*

Special Agent Garry E.W. Barnes, a resident agent of the Federal Bureau of Investigation in Maine with fifteen years of service as an agent, was notified in the forenoon of July 7, 1987 of the robbery of the Casco Northern Bank in West Buxton, Maine. He proceeded immediately to the scene of the robbery and joined the officers then involved in the investigation. At some point in his subsequent activities, he was notified of the apprehension of the Defendant. He went to the Bridgton Police Department headquarters for the purpose of interviewing the Defendant.

The interview which he conducted of the Defendant began sometime between 5:30 and 6:00 p.m. on July 7, 1987. It lasted

---

1. The Defendant initially took the stand as a witness at the hearing and was sworn. The Court then precipitated extensive discussions, on the record, with counsel in an effort to be sure that Defendant was properly advised in advance of his testimony as to the potential consequences of such testimony upon his fifth amendment right not to incriminate himself. As a result of these discussions, defense counsel conferred further with the Defendant and the Defendant then decided not to testify at the hearing.

2. This latter category of evidence was not identified in Defendant's Motion to Suppress. It was discussed in written submissions of Defendant prior to the hearing and was placed in contest at the hearing without objection by the Government.

approximately one and one-half to two hours. At the time of the commencement of the interview, the Defendant was in the custody of Maine State Police officers as an escapee from the Maine State Prison. Agent Barnes was aware of that fact prior to commencing the interview. Present at the interview in addition to Agent Barnes and the Defendant was Detective Maine State Police Trooper David Lyons, who was also involved in the bank robbery investigation and was waiting to question the Defendant concerning his alleged escape from the Maine State Prison.

At the beginning of the interview, Agent Barnes advised the Defendant of his *Miranda* rights. He advised him that he had the right to remain silent and that anything he said could be used against him. He advised the Defendant of his right to counsel and that an attorney would be appointed for him if he needed one. He further advised the Defendant of his right to stop the interview at any time in order to talk to a lawyer. Agent Barnes asked the Defendant if he understood the rights he had explained to him and the Defendant indicated that he did understand them. The Defendant then "expressed a willingness to talk." At no time during the entire interview did the Defendant request an attorney. It was Agent Barnes's impression that the Defendant was very cooperative and talkative. He stated that throughout most of the interview the Defendant was very "congenial."

Agent Barnes observed that the Defendant had no shirt on at the time of the interview. He further observed some red spots on his body. He inquired of the Defendant how he felt, and the Defendant responded that he felt "not bad." At no time did the Defendant request any medical treatment during the period of the interview. He told Agent Barnes that he had received some bee stings and mosquito bites. Agent Barnes observed the Defendant to appear to be "alert, thoughtful, and cooperative."

In the further course of the interview, Defendant confessed to Agent Barnes his participation in the robbery of the Casco Northern Bank in West Buxton, describing in considerable detail the preparations for the commission of the robbery with codefendant Marion Alice Norwood and the actual circumstances of its commission. He also described his peregrinations from the time he had escaped several days prior to the robbery from the Maine State Prison in Bucks Harbor, Maine.

The contents of the Defendant's revelations in the interrogation process are set out in Government's Exhibit S-3. That document was prepared by Agent Barnes in the following manner. At some point, Agent Barnes stopped the questioning and withdrew to another part of the interrogation room where he transcribed in the first two and one-half or three pages of the document what the Defendant had told him. Apparently while Agent Barnes was writing, Detective Trooper Lyons undertook his interrogation of the Defendant.

When Agent Barnes had completed the preparation of Government's Exhibit S-3 to the point where his interrogation had ceased, he then resumed with the Defendant by reading to him what he had written down in Exhibit S-3 to that point. He inquired if what he had read was accurate, and the Defendant replied that it was. He then continued the interrogation and obtained the information which he ultimately wrote down on the last part of page three or on page four of the statement. He then read the entire statement to the Defendant, again inquiring if what he had written was true. The Defendant acknowledged that it was. At that time, he asked the Defendant if he would sign the document, and the Defendant said that he would rather not since he did not have his glasses and he was very tired.[3] Agent Barnes "saw no problem with allowing the Defendant's request to delay the signing of the document." Accordingly, he did not add the

---

**3.** If the Defendant had indicated a willingness to sign the document, Agent Barnes intended to add to the document a final paragraph which stated in substance the number of pages contained in the statement and an acknowledgment by the Defendant that he had read it and that it was true to his knowledge.

intended final paragraph. Defendant did not subsequently sign the document.

After completing his interrogation, Agent Barnes apparently withdrew from the room and the Defendant remained in the custody of the Maine State Police officers.

### B. *The Statements Made in the Presence of State Trooper Marchessault*

The Defendant was apprehended by state or local police officers under circumstances not described in the evidence before the Court. Subsequent thereto, he was placed in Maine State Trooper Marchessault's police cruiser with instructions to the sergeant that he should be transported to the Bridgton Police Department headquarters.[4] Present in the cruiser with the Defendant and Marchessault was an unidentified Bridgton Police officer. Marchessault did not ask the Defendant any questions in the course of his transportation to headquarters. There is no indication that the other officer did so. Defendant, however, after asking the officers for a cigarette, volunteered the statement in the course of that transit: "My luck ran out today. It's been running out since I was fourteen years old."

Further, Trooper Marchessault initiated a radio transmission while in transit to another officer or officers dealing with the subject of where a weapon used in the robbery might be found. He indicated that no weapons were found with the Defendant. This was followed by another officer transmitting to a third unit a request to look for weapons in an area where the Defendant's vehicle had left the road during the police chase. That transmission was received on the radio on Marchessault's cruiser. The Defendant, apparently overhearing this transmission, stated: "Don't bother looking there, I dropped the gun back by the bank."

Thereafter, the Defendant made the observation: "Boy, there's he [sic] a lot of you here today." Marchessault responded: "We take this very seriously, we're quite concerned about a bank robbery." Marchessault testified that the Defendant then "indicated to me that he didn't want to hurt anyone back at the bank, he was rather nice to the girls and he instructed them, he told them to relax." These statements and the circumstances under which they were made are exemplified in Government's Exhibit S–1, which is Sergeant Marchessault's formal police report concerning his involvement in the investigation.

### C. *Agent Barnes's Interview With Marion Alice Norwood*

Evidence was admitted by the Court over a relevancy objection as to the circumstances of and events occurring during an interrogation of the codefendant, Marion Alice Norwood, by Agent Barnes and two Maine State Police Detectives. This interrogation took place at approximately 1:00 p.m. on July 7, 1987, about one and one-half hours after her apprehension and preceding Agent Barnes's interrogation of Defendant, Washington James Norwood, Jr., later in the day. This evidence was admitted as relevant to contentions by Defendant that Agent Barnes's testimony as to the interrogation of Washington James Norwood, Jr. is not credible.

Defense counsel proffered the evidence as relevant to the credibility and weight of Agent Barnes's testimony about what oc-

---

**4.** The only evidence in the record with respect to the events occurring in Sergeant Marchessault's cruiser during the period of the Defendant's transport is the testimony of Marchessault and Government's Exhibit S–1.

At the commencement of Marchessault's testimony, objection was made by defense counsel on the basis that the testimony of the witness had only been revealed to counsel the day prior to the hearing. He asked that the witness not be permitted to testify. Defense counsel, on inquiry by the Court, could point to no specific prejudice resulting from the lateness of the noti-

fication of this witness's testimony. In light of that, the Court admitted the testimony, indicating that it would hear favorably any request by defense counsel for "additional time to produce evidence to respond to it." The Court observed: "I believe it [the testimony] will be relevant and it will be admitted subject to whatever Court action may be subsequently taken to redress any prejudice that may be shown to have occurred to the Defendant because of the information recently disclosed to you." No further request from defense counsel for relief in addressing this testimony has been made.

curred in the later interrogation of Washington James Norwood, Jr.[5] Counsel's theory is that the two interrogations occurred in the investigation of the same offense, close together in time, and involved the interrogation practices of the same officer, Agent Barnes. Counsel argues that to the extent the evidence of Agent Barnes's conduct in the first interview displays police overreaching amounting to coercion or defective compliance with *Miranda* requirements, the Court might reasonably infer that similar conduct occurred in the later interrogation actually at issue here and therefore might question Agent Barnes's credibility.

Under circumstances not fully detailed in the evidence before the Court, codefendant Marion Alice Norwood was apprehended in the forenoon of July 7, 1987 in the Bridgton, Maine area.[6] Ultimately, she was taken, in custody, to the Cumberland Memorial Hospital in Bridgton, Maine. She was then under arrest. She was transported to the hospital by Bridgton Police officers. This information was apparently relayed to Special Agent Barnes, who went to the hospital and requested of the officers maintaining her in custody an opportunity to interview her. The officers agreed to that request after Ms. Norwood had received medical evaluation and treatment over a period of an hour and a half. Ms. Norwood was brought to an office in the front of the hospital building where Barnes's interview was conducted, commencing at approximately 1:00 p.m. Present with Ms. Norwood and Agent Barnes during the interview were Maine State Police officers Douglas Holmes and William Gomane. Ms. Norwood was then maintained in physical custody by an officer whose identity was unknown to Agent Barnes. That officer was not present during the course of the interview.[7]

Agent Barnes began his interrogation of Ms. Norwood, being aware that she was in formal custody, by advising her of her *Miranda* rights. The Court finds that Agent Barnes comprehensively stated to Ms. Norwood a description of the rights enunciated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He stated to her that: (1) she "didn't have to talk to him if I didn't want to"; (2) "if I did say anything that they could use it against me"; (3) she had a right to an attorney; and (4) she had a right to cut off the interview at any time.[8] Ms. Norwood stat-

5. Thus, evidence of what occurred in the course of the interrogation of Ms. Norwood has no direct evidentiary relevance to the voluntariness of Washington James Norwood's statements in the later interrogation or to the sufficiency of Agent Barnes's efforts to comply, in that interview, with *Miranda* requirements.

6. Ms. Norwood testified she was arrested at approximately 10:30 or 11:00 a.m.

7. Ms. Norwood testified that she "understood" that this individual was a Bridgton Police officer who also served as a Cumberland County Deputy Sheriff. There is no other evidence in the record which would identify the officer.

8. Agent Barnes was not asked any questions on direct examination about his interrogation of Ms. Norwood; the subject arose for the first time on cross-examination of Barnes by defense counsel. Defense counsel did not go into comprehensive detail as to what Barnes said specifically. He asked first if Barnes advised Ms. Norwood of "her rights," to which Barnes responded, "Yes, I did." Barnes said, "I orally advised her of her rights." Defense counsel then asked if he had advised her of "her right to an attorney." Barnes responded in the affirmative. Defense counsel then asked if he had advised her of "her right to have one [an attorney] appointed if she could not afford one." Barnes responded, "I believe so." Counsel then asked if he advised her of "her right to cut off questioning any time she wished." Barnes again responded affirmatively. Defense counsel asked no further questions about the subject on cross-examination.

At that point, Barnes's testimony displayed: (1) a general averment that he had advised Ms. Norwood of her "rights"; (2) specific averments that he had advised her of her rights to an attorney, that he *believed* that he told her of her right to have an appointed attorney if she could not afford one, and to end the questioning at any point; and (3) an *absence* of any specific averment that he told her that she did not have to talk to him and, if she did so, what she said could be used against her. The Government asked no questions on the subject on redirect examination of Barnes. This would require the Court, in order to find that Ms. Norwood was told by Barnes of her right to remain silent and that what she said could be used against her, to *infer* that those rights were described to her from Barnes's general averment that he "orally advised her of her rights" and that no specific

ed that she understood her rights.[9] He then asked if she wished to talk to him and received an answer indicating indecision on her part. *See* n. 9, *supra.*

Agent Barnes then explained to her that a search was then going on for a man who might be armed in the nearby woods who was thought to have committed or participated in the bank robbery. He stated that the search was being conducted in an area where there were family campgrounds and that numerous armed officers were participating in the search. He expressed concern to Ms. Norwood that this man be apprehended without danger to the officers, himself, or innocent third parties. He "solicited" her cooperation to assist in finding this man speedily. Agent Barnes and the other officers present advised Ms. Norwood that there was an immediate concern for human safety.[10]

Ms. Norwood responded by stating that the individual in the woods was not armed. She said that she did not know where the gun in question was and that it had been thrown out of the car long before the car was stopped. She stated that she had spent the prior night sleeping in the woods somewhere in Buxton off the Standish Road and advised the officers of a medical condition consisting of three prior heart attacks and an instance of abdominal surgery in January of 1987. Otherwise she "remained mostly silent."

The only square collision between the testimony of Agent Barnes and Ms. Norwood occurs as to whether he denied repeated entreaties by her to use the ladies' room during the interview. According to Agent Barnes, at some time during the course of the interview, Ms. Norwood asked to use the ladies' room. Agent Barnes testified that she was permitted to do so in the custody of an officer. To Agent Barnes's knowledge, that was the first request she had made for use of toilet facilities. He denied that he refused any request by Ms. Norwood to use the toilet facilities. Agent Barnes testified that during the interview Ms. Norwood was obviously upset and that she may have cried during the course of the interview. He stated that he was not aware at any time during the interview that Ms. Norwood was embarrassed by any physical condition and that he was unaware that she had soiled her undergarments.

mention of such advice was made in his testimony on cross-examination because defense counsel shaped the content of the questioning by the specificity and selectivity of his particular questions. In all the circumstances relating to the interrogation of Ms. Norwood, such a rationale, without more, would leave the Court in some intellectual discomfort in view of the fact that the Government bears the burden of proof on these issues.

The evidentiary void is filled, however, in the testimony of Ms. Norwood. She testified specifically that Barnes had told her of the right to remain silent and that what she did say could be used against her as indicated in the quoted warnings designated (1) and (2) in the text. This testimony sufficiently buttresses the inference to be drawn from Barnes's general averment that he "orally advised her of her rights" to satisfy the Court that those subjects were covered by Barnes with Ms. Norwood. The Court is also satisfied that Agent Barnes advised her of her right to appointed counsel.

9. Agent Barnes testified very specifically on cross-examination that Ms. Norwood acknowledged understanding her rights and that she had responded "I don't know" to the subsequent question from Barnes as to whether she wished to talk to him. He cogently reaffirmed this version on redirect examination. Ms. Norwood testified that she said "I'm not sure" *both* when asked to acknowledge that she understood her rights and when asked if she wished to talk to Barnes.

The Court finds Barnes's version of the conversation to be persuasively credible. That conclusion does not resolve the question, if the issue to be resolved were the admissibility of what Ms. Norwood said thereafter *as against her*, as to what Barnes should properly have done when Ms. Norwood responded indecisively to the question as to whether she was willing to talk to him. There is no dispute but that she did respond to that inquiry indicating indecision on her part, the only variance in their testimony being as to the specific words she used; *e.g.*, "I don't know" versus "I'm not sure."

10. Agent Barnes denied on cross-examination that he had told Ms. Norwood that she should talk to him in order to protect her husband. Ms. Norwood did not testify that Barnes made any such statement to her. She did say on direct examination: "My impression was that I'd better tell them he was not armed or they were going to shoot him."

Ms. Norwood testified, however, that she had a severe case of diarrhea which required her to void several times at the hospital before Agent Barnes's interrogation began and that she was allowed to do so. She said that during the interrogation the need to do so occurred again. She requested to be allowed to do so and, according to her, Agent Barnes refused the request. She stated that she made the request at least four times during the interrogation and that Agent Barnes refused it each time, on one occasion saying, in effect, that there was great urgency for his interview with her in order to find out the facts about the person being sought in the woods and that she could go to the bathroom after the interview was completed. She testified that she was "crying hysterically" at some point during the interview, that she was scared, and that she was embarrassed by people watching her from outside the room where the interrogation occurred. She stated that she soiled her undergarments and then told the officer "I don't want to talk to you anymore, please" and requested them to "let me go to the bathroom." According to her, the interrogation was ended at that point and she was taken to the ladies' room.

The testimonial variance between these two witnesses may, then, be cogently summarized as follows. Agent Barnes states that Ms. Norwood requested on one occasion to use the ladies' room and that the request was granted. He categorically denies refusing any such request. He claims not to be aware that she had voided in her undergarments. Ms. Norwood, on the other hand, tells a grim story of at least four refusals of such requests, resulting in her soiling her undergarments, supposedly because of the officer's perceived urgency in completing the interrogation.

## III. *Discussion*

### A. *The Credibility of Agent Barnes*

■ It is important to bear in mind that in resolving the dispute in the testimony of Agent Barnes and Ms. Norwood, the Court is not doing so in order to determine the admissibility against Ms. Norwood of either of the two incriminating statements that she made in the course of the interview with Agent Barnes.[11] Rather, the Court is asked, and seeks, to assess and resolve the variance solely for the purpose of determining whether what happened on this point in the course of the interview with Ms. Norwood is so at odds with Agent Barnes's testimony about what occurred as to cast doubt upon his general credibility as a witness in respect to his testimony about the circumstances and events relating to the interrogation of Washington James Norwood, Jr.

The determination as to which of these witnesses is telling the truth on the narrow point at issue is one which the Court concedes is not without its difficulties. In terms of demeanor and sincerity, both witnesses *appeared* to the Court to be candidly stating what happened. The evidence displays no circumstance that would permit the variance between the two versions to be explained by differing perceptions of the same events. Their testimony, in each case, goes to the nature and content of the statements which passed between them in a face-to-face conversation. Each of them

---

11. The Court thinks it significant to note that on the issue of the voluntariness of the two incriminating statements that she did make, the resolution of the issue as to which of these two witnesses is more truthful is of no practical significance. Her only incriminating statements, even by the Government's proof, were (1) that the subject being sought in the woods was unarmed, and (2) that the gun used in the robbery had been "thrown out of the car long before the car was stopped." Government's Exhibit S–4. The Court is satisfied that Ms. Norwood's own testimony shows that in the chronology of the interrogation, these statements were made early on in the interrogation, immediately after the advice was given as to her rights. She gives the clear impression that the discussion over her need to use the bathroom occurred thereafter. She makes no assertion in her testimony that she made these statements because of her need to use the bathroom. Rather, the Court perceives quite clearly from her testimony that the gravamen of her complaint about the refusals of her alleged requests goes to the officer's refusal to end the interrogation after she had made those statements. The Court is satisfied that, even if the refusals did occur, they did not induce, in any causal sense, her incriminating statements.

must have personal knowledge of the events in question as they occurred. Neither version of the events in question, taken by itself, lacks internal consistency. Yet, one of them must be testifying falsely, and deliberately so. In terms of demeanor, apparent sincerity, and the internal consistency of their respective testimony on this issue, there is little, in the view of the Court, to assist the Court in determining which of them is testifying untruthfully.

The Court is satisfied, however, that circumstances external to the testimony itself as given in the courtroom, and inferences which may properly be drawn therefrom, permit the resolution of that issue. It is clear to the Court that at the time the interview of Ms. Norwood was conducted, Agent Barnes and the other officers had an overriding concern: namely, to determine from any available source, including Ms. Norwood, whether the suspect being sought in the woods in the vicinity where Ms. Norwood was arrested was armed and might, therefore, pose a danger to himself, the pursuing officers, or to innocent persons in the vicinity of the search. Agent Barnes and the officers so stated to Ms. Norwood in the course of the interview in succinct terms. Agent Barnes acknowledged in his testimony that such a discussion was had and that such a concern was present in his mind. He pressed Ms. Norwood to get any information on that subject in the face of her indecisive answer as to whether she wished to talk to him after being advised of her rights. Yet, it is most significant that *he acknowledged that he did so.* He did not dispute the indecisiveness of her answer to that question.

As an experienced agent, he must certainly have known that her indecisiveness on that point would raise serious questions about the admissibility as *against Ms. Norwood* of any information which he obtained from her in the pursuit of the interview beyond that point. *See Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). Agent Barnes plainly made a conscious determination to press her on this subject matter in order to resolve the most serious problem of the moment, determining whether the fleeing suspect represented a danger to himself and others. The Court is satisfied that while he did not expressly testify to that specific mental decision on his part, the reason he did not is because he was not asked any specific question by either counsel to elicit such a response, or any contrary one.

Yet, the Court finds it significant, in view of the defense's contention that Agent Barnes lied about the matter of the denial of Ms. Norwood's alleged requests to use the ladies room, *that he did not* attempt to conceal her indecisive answer regarding her willingness to talk to him. The Court concludes that if Agent Barnes was prepared, under all of the circumstances, to prevaricate with respect to the former subject, it is highly likely that he would have done so with respect to the nature of her answers to the ultimately pivotal *Miranda* question. If his goal in testifying was to preserve the admissibility against Ms. Norwood of the statements made by her in the course of the interview, he, as an experienced agent, most likely was well aware that pursuing the interview in the face of the indecisive answer from Ms. Norwood posed as great a hazard to the admissibility of her statements against her as would a repeated refusal to permit her to use the ladies room in the course of the interview, especially under the circumstances she described, by implicating the underlying voluntariness of whatever she had to say. The Court can discern no reason, therefore, why he would candidly admit that the first occurred and then lie about the second subject matter.

Alternatively, the agent, as a member of the prosecutorial staff, can be inferred to have been aware that at the time Ms. Norwood testified, she had pleaded guilty to her role in the bank robbery. Because he was likely aware that there was no need to be concerned about the admissibility of what Ms. Norwood had said in the interview *as against her,* he had no reason to fabricate his testimony to that end.

Further, to accept the defense's proposition that he simply lied about what happened with respect to the bathroom requests would require the Court to conclude

that an experienced law enforcement officer would lie under oath about what transpired between him and Ms. Norwood in the interview when that interview was conducted in circumstances such that he had to know that there were at least two other officers, besides Ms. Norwood, who knew all or a significant part of what actually occurred and who could be arrayed as witnesses against any incorrect version of the events which he told under oath. The Court finds it unreasonable that this officer would lie, thus involving himself in a swearing contest with Ms. Norwood in which he obviously ran a very substantial risk of being exposed when there was nothing to gain in terms of the admissibility of her testimony. According to Ms. Norwood, there were numerous other people present in the vicinity where the interview took place, and if the circumstances which she describes of soiling her undergarments was as noticeable as she contends, presumably even other witnesses would be available to confirm her version that this did happen. In short, the Court cannot conclude that this experienced and knowledgeable agent would take such a grave professional risk in the face of so much available evidence to demonstrate any falsity in his testimony on the point.

On the other hand, the Court is satisfied that it can reasonably be inferred that Ms. Norwood has a strong motive to assist her husband in the ongoing prosecution. Impeaching Agent Barnes as a witness, and thus perhaps securing the suppression of her husband's severely incriminating confession, would obviously be a significant step toward aiding the codefendant Washington James Norwood, Jr.'s position at the forthcoming trial. The Defendant's own assessment of her devotion to him displays it to be intense. He told Agent Barnes in his interrogation that "[w]hatever she [Ms. Norwood] did [in the robbery] she did it because I told her to do it and she will do whatever I tell her to do." Government's Exhibit S–3 at 1. It is not unreasonable for the Court to infer that a wife who will participate in armed bank robbery, apparently solely out of devotion to her husband, will not scruple to fabricate or to shade her

testimony to his advantage in the resulting criminal prosecution. She, too, must certainly have been aware that there was other available evidence as to what occurred on the occasion in question to refute any incorrect version thereof to which she might testify under oath. She does not have, however, the same professional inhibitions which govern Agent Barnes, and create serious concern for him about being exposed in a perjury. Rather, she is possessed, in the view of the Court, by a perceived self-sacrificial obligation to assist her husband which encompasses aiding him in obtaining a satisfactory resolution of the prosecution against him.

The Court's conclusion is, therefore, that Agent Barnes testified truthfully when he stated that during the course of the interview in question, Ms. Norwood made a request to use the ladies' room and was afforded an opportunity to do so, that at no time did he deny any such request, and that he was unaware of any condition of physical distress on her part during the course of the interview. The Court disbelieves, on the other hand, the testimony of Ms. Norwood that she made four such requests which were denied by Agent Barnes and that as a result thereof she voided in her undergarments.

### B. Statements of Defendant Made While Being Transported by Officer Marchessault

There can be no question that the Defendant Washington James Norwood, Jr. was in custody in Officer Marchessault's cruiser at the time he made the statements which he now seeks to suppress. Thus, one prong of the underlying predicate to invoke the benefit of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is present in this case. However, there is a total absence of any evidence to establish that the second prong of that predicate existed during the period of such transportation. That prong is the requirement that "an interrogation or its functional equivalent," *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), be undertaken during a period of

custody, yielding incriminating answers.[12] Here the evidence makes it clear that the officers did not initiate at any time any conversation with this Defendant, much less conduct any questioning of him. The Defendant's first statement about his luck having run out was made without any prompting by the officers. Similarly, the second statement which he challenges, he volunteered as a result of hearing certain radio transmissions received on the cruiser's radio. Those transmissions were not directed to the Defendant. He was apparently attempting to relieve the officers of the need to pursue vain search efforts to locate the weapons used in the robbery. The officers said nothing to him and took no action which an objective police officer or civilian observing the events in the cruiser could reasonably have taken to indicate that Defendant was expected to respond to or comment on these transmissions. His comments were not elicited by the police in any way.

With respect to the third statement, about his conduct at the bank during the robbery, that too was gratuitously made by the Defendant. He volunteered an observation about the number of police officers in the area, to which Marchessault responded, matter-of-factly, to indicate that police officers do treat bank robberies seriously. The form of the comment was not such as could be viewed as reasonably likely to elicit, and did not require, *any* response, let alone an incriminating one. Defendant apparently was trying to serve his own perceived interests by minimizing the seriousness of the offense by his response. Nothing occurred in this brief conversation that could in any way be properly characterized as interrogation or its functional equivalent.

■ In such circumstances, it is clear that the challenged statements are not subject to suppression because of any violation of *Miranda* requirements. Further, it is clear, and the Court so finds, that the mak-

ing of the statements was entirely voluntary on the Defendant's part.

## C. *The Confession Made in the Interrogation by Agent Barnes*

Defendant challenges the admissibility in evidence of the confession which he made in the course of interrogation by Agent Barnes on the evening of July 7, 1987. He asserts that the interrogation was not preceded by an adequate explanation of his *Miranda* rights, was in violation thereof, and that the confession was not voluntarily made. The only evidence in the record as to what occurred in the course of that interrogation is the testimony of Agent Barnes and the Government's Exhibits S–2 and S–3.

■ Agent Barnes's testimony demonstrates by a clear preponderance that the Defendant was fully and completely advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that he indicated affirmatively that he understood those rights, and that, knowing those rights, he affirmatively indicated his willingness to be questioned by Agent Barnes. There is, in fact, nothing in the record to indicate any defect in the *Miranda* advice given by Agent Barnes and nothing to dispute the accuracy of his testimony that the Defendant, after receiving those warnings, affirmatively indicated his understanding of them and his willingness to be questioned. The Court concludes that there was no violation of any *Miranda* rights of this Defendant.

■ A circumstance that Defendant asserts inferentially leads to such a conclusion is that the Defendant refused to sign the written statement prepared by Agent Barnes after it had been completed. It is absolutely clear upon this record, however, that the Defendant displayed no reticence whatever in answering the questions that Agent Barnes asked. At no time did he

---

**12.** On cross-examination defense counsel asked Marchessault if a *Miranda* warning was administered to Defendant in the cruiser. Marchessault responded in the negative. The Court concludes that no such warning was required, in-

deed appropriate, because the officers had no intent to interrogate the Defendant and did not, in fact, engage in interrogation of the Defendant or its functional equivalent.

refuse to answer any question and at no time did he attempt to limit the interrogation in any manner. He simply stated, when presented with the completed written statement, that he would prefer not to sign it at that time since he did not have his glasses and that he was tired. Even an adamant refusal to sign it at that point in time would not be an invocation of his *Miranda* rights sufficient to denigrate the admissibility of what he had said *prior* to such a refusal. The Court thinks it significant *in assessing his state of mind,* that his declination to sign the statement was couched in terms of a preference based upon the absence of his glasses and the fact that he was tired rather than as an adamant refusal to sign the statement in order to protect his rights.[13]

 The record is even clearer with respect to the voluntariness issue. The testimony of Agent Barnes makes it clear that this Defendant, after being advised of his *Miranda* rights, "expressed a willingness to talk" and that he remained throughout most of the interview "very congenial." He stated in response to a question by Agent Barnes that he felt "not bad." At no time did he request any medical treatment during the period of the interview. He indicated only that he had received some bee stings and mosquito bites. He did not indicate any feeling of distress from these. Agent Barnes's testimony was that the Defendant appeared to be "alert, thoughtful and cooperative." The text of his confession, as set out in Government's Exhibit S–3, corroborates his demeanor in that respect.

Ms. Norwood testified that when she saw Defendant at the courthouse the day after his interrogation,[14] he was covered with swollen bug bites and scratching. Because

it refers to a period significantly later than the interrogation, this testimony is less relevant and persuasive than Agent Barnes's in determining Defendant's condition on the evening of the interrogation. Even taking the testimony facially, it does not describe the Defendant as then suffering any significant level of physical distress and certainly does not show any mental or emotional effect of the bites calling in question his ability even at that time to act voluntarily.

It is entirely clear, indeed the Government concedes in its written submissions, that the Government bears the burden of proof to demonstrate by a preponderance of the evidence adequate compliance with *Miranda* requirements and the voluntariness of the confession in question. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Taking into account the Court's resolution of the only challenge to the credibility of Agent Barnes in favor of his credibility, *see* Part III, A, *supra,* the Court concludes that the Government has clearly carried its burden of proof to demonstrate full compliance with *Miranda* requirements and that the confession in question was voluntarily made by the Defendant.

Accordingly, the motion to suppress the evidence in question is hereby DENIED.

---

**13.** The Court finds it significant, in assessing Agent Barnes's desire to conduct this interrogation properly, that he readily acceded to Defendant's request, saying that he "saw no problem with allowing the Defendant's request to delay the signing of the document."

**14.** Ms. Norwood said she first saw the Defendant some eighteen hours after her arrest (which occurred several hours before the Defendant was himself arrested). At the time of this en-

counter, at the courthouse, she stated that she saw his arms, hands, and at least part of his chest. She described his condition then as follows: "He was covered with bee stings, he was badly swollen, his arms and chest he was scratching and digging. . . ." She described the bites as "lumps, swollen. As I said, he repeatedly was scratching." She estimated that there were 100 such bites, "maybe more."